The United States Court of Appeals for the Federal Circuit is now opened and in session. God save the United States and this honorable court. Good morning ladies and gentlemen. We have four cases this morning, two of them being argued. The first is Sionyx LLC v. Hamamatsu Photonics, 19-2359. Mr. Simmons, good morning. Good morning, Your Honor. Mr. Simmons, you've raised a lot of issues and I think we need to get down to the key ones right off the bat. Tell us what you think about ownership of patents. So, Your Honor, the district court abused its discretion by transferring complete ownership of the disputed U.S. patents to Sionyx based on an incorrect reading of the mutual nondisclosure agreement. Sionyx and the district court treat the NDA as if it were a one-way NDA, even though it was specifically negotiated to be a two-way mutual NDA. Its purpose was for both parties to exchange confidential information. At Appendix 2881, which is the MNDA, the preamble states, each of the parties has developed information that each party regards as confidential. Each party proposes to disclose certain of such confidential information to the other party. Mr. Simmons. Counsel, if you're correct, and this is getting into the cross-appeal, why shouldn't that apply to the foreign patents? Presumably, the foreign patents provided the priority dates for the U.S. patents, so why isn't it good for the goose, good for the gander? We would agree that it should also apply to the foreign patents to the extent that there's evidence of record about the foreign patents. So, if the finding of co-inventorship were found, then it would apply to the foreign patents. All right, so you're conceding part of the cross-appeal. I'm not completely conceding it, Your Honor. I think there was a failure of proof on the cross-appeal that the burden was on the plaintiffs at the time, the cross-appellants, to put in evidence of what was contributed to the claims of the foreign patents. And, in fact, the only foreign patents that were put in the record were the Japanese patents. None of the other countries were actually listed by number, even though the cross-appellants are asking you to transfer them all to them. So, I think there's just a failure of proof with respect to the foreign patents. I think Judge Moreno had a question. This is Judge Wallach. I had several questions. Go ahead. In reference to the mutual exchange of confidential information in response to Judge Lurie, and on page 7 of the blue brief, you say, Did Hamamatsu direct CYONIX to return or destroy any information? Tell me, did Hamamatsu direct CYONIX to return or destroy any information? Not on the record, Your Honor, no. So then we can presume that you did not. That's correct. Okay. And yet you're saying that you want us to presume that you provided confidential information. Is that correct?  And yet you also say that if CYONIX didn't direct you to destroy anything, that we should presume that it neglected to do that, so there's no proof there. Is that correct? I'm sorry, I didn't understand that question, Your Honor. Okay. You say they neglected to direct that. The mutual non-disclosure agreement says, If the disclosing party has not directed the receiving party to return or destroy confidential information, the returning party shall return all such information. Did you return anything to CYONIX? No, and in fact, Your Honor, that's part of our statute of limitations argument, is that the failure to return confidential information under paragraph 7, the notwithstanding clause, was a breach of the agreement. And CYONIX was aware of that in February 2008, so it knew that we breached, that HPT breached. Mr. Simmons, stop talking when I talk. I'm sorry, Your Honor. Okay. We'll go a lot faster if you just answer my questions. Okay? Of course. On page 21 of the blue brief, Hamamatsu asserts that the district court rationalized evidence and that it contended. They, of course, don't do that, do they? I'm going to keep going since you're not answering. Yeah, I'm sorry, I don't understand the question, Your Honor. Mike, it wasn't a question, it was a statement. Courts don't rationalize, they don't argue, they don't contend. They find and they hold. On page 31, footnote 6 of the blue brief,  What's the basis for that statement? Well, what's the relevance of it? What's the relevance of it? Yeah, why is it? Do you have anything in the record? The answer is no, isn't it? Well, the argument made by cross-appellants was that because they were a small startup company, that we were trying to, HBK was trying to drive them out of business. So that's the relevance of it. Do you have any information in the record to that effect? Only what's publicly available, Your Honor. Not what's specifically in the record. Uh-huh. Okay, let's get back to substance. I'm sorry? Counsel, what about the statute of limitations? The jury seemed to find that that was not a bar to all the damages to the breach claim. I'm sorry, Your Honor. What we're specifically focused on here today is that the failure to return within the 30 days, as Judge Wallace pointed out, the notwithstanding clause, since Sionics did not ask for HBK to return the information within 30 days, HBK had to return the information within 30 days. And it did not. And that was a breach. And Sionics has admitted at least three times in its red brief that the failure to return the confidential information caused its harm. So our argument is that the failure to return the confidential information on February 10, 2008, was a breach, and Sionics was aware of it. They knew that HBK still had its information, in fact. But apparently the jury found that that was not a bar. And these are facts, are they not? The jury found that it was immaterial, the breach was immaterial, or that Hamamatsu had concealed the breach. And so this is a jury finding based on facts. Don't we have to give a lot of deference to that? So there's two issues here. There's one issue, there's a breach by failure to return the information within 30 days. And the second was in a second argument that's in our briefs and we'll stand by it, is in February of 2009 when Hamamatsu sent detailed drawings, that then Sionics would be on notice that Hamamatsu was still using its confidential information, which would be a second type of breach. With respect to the breach that the jury found, they found it based upon a February 1, 2008 report that would demonstrate Hamamatsu was using the confidential information, but that was a different concealment argument. With respect to not returning the information, Sionics knew it didn't have its information back. In fact, Dr. Terry was asked about the February 2008 email, which says, did you feel at that point in time that you needed to tell Hamamatsu not to reference your proprietary information? No, I think they said they were not going to. So that was Appendix 820, which demonstrates implicitly that Sionics knew Hamamatsu still had its confidential information and the harm could have been prevented by them asking for it back. Counselor, this is Judge Reina. It seems to me that under Massachusetts law, a jury can be charged with determining whether a claim is barred by the statute of limitations, right? Let's provide a fair Massachusetts law. Okay. So here, the jury determined that the non-return of information was not a material breach. Why should we disturb that finding? There was a lot of confusing information put in during the trial about what allegedly was lulling or defrauding Sionics. I understand that, Counselor. I understand that. And that information and those questions were put to the jury. And the jury deemed that the return of information, the non-return, was not a material breach. It seems to me that that was fairly within the right of the jury to decide. And my question is, looking at that determination, why should we disturb that jury determination? Right. This Court reviews it without deference to the District Court and applies the No Reasonable Juror Standard. There's no dispute that the information was not returned by the deadline of February 10, 2008. That failure to return was a breach because Section 7 required the return within 30 days. So there could have been no lulling, and no reasonable juror could have concluded that HPK returned Sionics' confidential information. Therefore, a reasonable juror would have had to conclude that HPK had breached by not returning it. But at the same time, HPK is also making a number of assurances that it's not using Sionics' confidential information. So it seems to me that your arguments to the jury that you did not use Sionics' confidential information goes against, does not help your argument concerning the jury verdict. I think I understand. One of the issues at trial was whether the information was confidential or not, and HPK put on evidence about what it believed was not confidential. So HPK had a good faith belief that it wasn't using Sionics' confidential information. So had HPK returned the information, there could have been no dispute about what was confidential and what was not. Again, that's a good attorney argument, but it's an argument that was put to the jury, and the jury held against you. Why should we disturb that finding by the jury? Because no reasonable juror could have found that Alamatsu returned the information, and Sionics basically has never argued that it did, and that term was material. So that's a specific rifle shot issue. But your argument is also that you never did use any of the confidential information. Well, HPK didn't believe it was using confidential information because HPK believed Sionics' technology was limited to texturing and sulfur, and HPK textured in nitrogen, never in sulfur. So HPK had a good faith belief that they weren't using Sionics' technology. Okay. Counsel, you wanted to save eight minutes, and that's fine, but if you wanted to continue a little bit into your rebuttal time, that's all right, because probably your cross-appeal is sort of lighter than your main appeal. Up to you. I have a long one. Thank you, Your Honor. I'd like to answer your questions as well. All right. Let's start where we were. Five more minutes. On page 50 of the blue brief, Alamatsu contends that district abused discretion when considering the lack of factual findings related to the content of the disputed patents. The verdict is as to the claim under Massachusetts law for breach of contract we find for Sionics. Did Alamatsu request specific jury instructions going through each of those issues? So the disputed patents were really only in the case to determine inventorship? Mm-hmm. So the only instructions about that was... I couldn't hear you. Yeah, sorry. Did you ask for a jury instruction which let the jury specifically decide whether your argument about Sionics being on notice was sufficient to defeat their claims? I don't believe we did. Okay. On page 52 of the blue brief, you say the district court enjoined Alamatsu indefinitely from selling the accused products even though those would never be independently actioned, effectively a punishment for an earlier breach. What's your legal authority for that statement? I mean, effectively, under your standard, isn't every injunction a punishment? Well, the district court found... awarded a permanent injunction in this case and the parties had specifically negotiated a seven-year confidentiality period. And after the seven years was up, that would no longer apply. By the district court awarding a permanent injunction, it basically read out the seven-year negotiated term. And that's in Section 8 of Appendix 2882. The obligation set forth in Section 2 is to remain in effect for a period of seven years. So by issuing a permanent injunction... Counsel, you're down to about five minutes of rebuttal time. Do you want to save that? Yeah, may I reserve the five minutes, Your Honor? Yes. All right. Mr. Belanger. Thank you, Your Honor. So I want to just start with addressing, if it pleases the court, the question on the ownership of the foreign patents. Counsel, during his argument, suggested there was no evidence presented regarding ownership of the Japanese parent applications. And that's just not the case. There's multiple citations for the record in a gray brief at page 59 where we put in extensive evidence, including testimony from Dr. Carey, that the Japanese patent applications, the figures were identical to those in the U.S. case. But more importantly, that Hamamatsu themselves filed the U.S. applications under 35 U.S.C. 119A, stating that they were for the same inventions as the Japanese applications. And in fact, HPK stipulated to that fact at trial. So there is a stipulation, as well as record evidence, that amply supports that the finding of ownership of the U.S. patents should apply equally to the foreign patents. And the citations for the record are found in the gray brief, pages 59 and 60. Do you accept that the ownership of the patents worldwide should be joint because the parties work together? No, Your Honor. So we strongly dispute that. And that very argument was put to the district court. And we do not believe that the district court abuses discretion in finding sole ownership as opposed to joint ownership based on interpretation of the contract, as well as the district court considering Hamamatsu's argument that there was some, possibly some unidentified Hamamatsu confidential information disclosed and discounting that. And I point, Your Honor, to Appendix 585 to 586 and Appendix 838, where there is record evidence that supports the district court's finding that no confidential information was disclosed by Hamamatsu to Psyonix. And what the district court found, and we believe is a correct reading of the contract, but for this court's purposes, not an abuse of discretion in reading the contract, is it would be antithetical to the purpose of Section 5 of the agreement to say that Hamamatsu could take Psyonix's confidential information, misuse it to develop products, and file patents on it, and because they allegedly, without evidence, mixed Psyonix's confidential information with some of its own confidential information, somehow it became the co-owner of that confidential information. So, firstly... If Hamamatsu is stated to be a co-inventor, companies aren't inventors. Hamamatsu's scientists, engineers, must have made contributions, and whether it's confidential or not is not relevant to inventorship. So why, if the parties work together, wasn't Hamamatsu's inventor a contributor, and therefore Hamamatsu would be entitled to co-ownership? Because, respectfully, Your Honor, the district court disagreed with that interpretation of the contract. The contract states that Psyonix, as the party disclosing confidential information, would be the sole owner of any patents in or resulting from the confidential information, and so the finding does comport with the record evidence that Hamamatsu took the confidential information, used it in order to file the patents, and whether their individuals could be characterized as co-inventors, as Your Honor is correct, they are not the owners. The contract would control, and the contract states that Psyonix would maintain ownership, not just to disclose confidential information, but any patents that were derived from that confidential information. So it's sort of a food-for-the-poisonous-tree argument, Your Honor, which was the basis for the judge's finding of sole ownership. Counselor, this is Judge Arena. Let me ask you a quick question regarding the award of the injunction. HPK is arguing that the award was overbroad because it enjoined all the products that practiced the disputed patent, and it did that without finding infringement. What's your response to that argument? Yes, Your Honor. So I believe that there was evidence presented, and you said it in the brief, that the products did practice the disputed patent. There was testimony from the fact witness of Hamamatsu. There was also evidence presented that the basis for advertising those disputed products was based on the same technical content as in the disputed patent. But aren't those arguments a little unstable? Because there never was a finding of infringement. I would concede there was not a finding of infringement. There was a finding of breach of contract based on the same confidential information that made its way both into the products and the patent. And so the court enjoined further sale of the products that used that confidential information and enjoined sale of the same class of products that also practiced the patent. But that's not what the injunction does. It's not limited to product center. It's limited to products practicing the disputed patent. It doesn't say anything about the confidential information. And respectfully, I think it does and or. So it does refer to the disputed patent and says and or practicing the disputed patent. And I would point out, Your Honor, that Hamamatsu did ask the district court for clarification of that portion of the injunction. They actually asked that the court substitute the word practicing for the word infringing. But they also asked for a finding that a certain process be found to be outside the scope of the injunction and the court declined. Okay. So in an argument in the future that there's products that are practicing the disputed patent, does the injunction include that within a scope or does there have to be some type of finding of infringement? I'm concerned that the injunction may deal out the necessity of finding infringement in the future. What I'm trying to say is that the products are practicing the disputed patent. And I think the scope of the injunction is consistent with the court's authority. The First Circuit gives the court broad authority to effectuate relief. It covers the products that were litigated and the court's precedent is clear. Products that are only colorably different from the products that were litigated would also be covered. And so the finding is that there are two different products that have the attributes of the disputed products. I apologize, Your Honor, for just backing up and making one clarification point. So the disputed patents on the end product, the end result, the asserted patent and the patent infringement was based on a specific process. And so there was extensive evidence put on a trial by Hamamatsu and considered by the district court that there was no evidence described in the disputed patents. And so the clarification that Hamamatsu asked for was to exclude one of those two processes. And we would respectfully submit that the end product is what's being enjoined, not the process by which it's made. Thank you. Thank you. Counsel, back to Rona Schripp again. Was there no evidence that Hamamatsu contributed confidential information to the joint research? I'm not aware of any such information. There was definitely evidence presented that they did not. And that was certainly evidence that the jury and the judge could have believed in would have supported the judge's finding of sole ownership. Now, on the statute of limitations issue, if we found that there was a bar because there was a breach in 08, does that eliminate all the non-patent remedies? If this court were to find that there was a statute of limitations, yes, I believe that would eliminate the contract remedies. Yes, Your Honor. Okay. Now defend the conclusion that the 2008 failure to return the information marked the breach because the jury didn't find that? Correct. All of Mr. Simmons' arguments were presented to the jury, and that evidence was presented to the jury around the question of whether there was a wrong or fraudulent concealment of any breach. And the record evidence is clear that Psyonix asked Hamamatsu to secure its confidential information and to confirm that it would not use it, and Hamamatsu so confirmed. They confirmed that they would make no use of the information and said they had no interest in the technology. And so that is certainly under the First Circuit standards of whether the evidence was so strong and overwhelmingly inconsistent with the verdict that no reasonable jury could have returned it. There's definitely evidence in the record that the jury could have weighed to say that that was not a material breach to merely keep information and to suggest that the material breach here was the use of the information and to suggest that merely allowing Hamamatsu to keep information without using it is the same as allowing them to keep information and use it, which they repeatedly insisted they would not do. I think that is certainly evidence that's supportive of the jury's verdict of no violation of the statute of limitations. You may proceed. Thank you. And just to make sure that I'm directing you to the correct record evidence, appendix pages 3013 to 3017 is the email exchange at the time in 2008 where Mr. Kobayashi of Hamamatsu and Mr. Saylor at Psyotics had an exchange of emails where Hamamatsu repeatedly assured Psyotics that it would not make any use of its confidential information and would respect it. So I think that adequately supports the jury's verdict. Regarding the patent injunction, I know in the required brief, appellants contend that there's no evidence of competition. Just to touch on that briefly, I believe this court's case law is clear that competition is not the full requirement for enjoining further infringement. But if it were, there is record evidence of competition, and specifically there's record evidence that Psyotics was harmed through the loss of a contract with Nikon, and there's also record evidence that, and this is at appendix 1238, that Hamamatsu was supplying the infringing products to Nikon and had a contractual relationship with Nikon. At the same time, Nikon was discontinuing its work with Psyotics. And so that is evidence within the record that a reasonable jury could have concluded and that the court could have relied on, the trial court could have relied on to find that there was direct competition. On the issue of willfulness, just to hit that briefly, that is also relevant to the cross-appeal. So on the issue of willfulness, there's undisputed record evidence that the parent application for the patent that was found to be infringed and willfully infringed by the jury, that parent application was in Hamamatsu's files. It was studied and evaluated in the context of developing the infringing products. There's evidence that they copied the Psyonix technology. So there's ample evidence. I think in some of the briefs, Hamamatsu says the patent was not filed until after the alleged bad acts. That's just not consistent with the record. The record is that they had a copy of the exact specification, the parent application in their files, and they had that specification before they copied Psyonix's products. And so that should not provide the ability to sidestep the finding of willfulness. Further, there was evidence that Hamamatsu was monitoring Harvard's patents and Psyonix's patents. While the only specific evidence of monitoring the patent family at issue was extended from 2006 to 2009, that was sufficient, as the trial court found, to create an inference that that monitoring continued until after the issuance of the 467 patent at issue. So there's certainly evidence to support the willfulness finding. And I would, if I could shift to the cross-appeal briefly on this. Yes, go ahead. So on the issue of exceptional case, I would just state briefly, we believe that the trial court's error there was in misapprehending the standard of finding the case exceptional in believing that some subjective bad faith on the part of counsel was required. And we believe that this court's law consistently has held that a finding of willfulness by itself and objectively unreasonable behavior can support a finding of... Counselor, are you saying that the court did not apply octane in its analysis? Did not apply octane correctly. That's right, Your Honor, correct. The court does cite the octane. However, the court, we believe, respectfully, misapplied it by believing there was a subjective intent requirement as opposed to looking at the conduct objectively and also acknowledging that a finding of willful infringement, which we have here, can be enough to find a case exceptional. You mean the judgment was low octane? Ha! Yes, Your Honor. You may continue or we'll save the remainder of your time for the cross appeal if there's something to respond to from appellant. So we'll save it for you. And, Your Honor, just one last point, if you don't mind, on the prejudgment interest question. There was a new case cited in the appellant's reply brief on that point. It was a Massachusetts State Trial Court decision. And I would just point out that the case that we rely on and that the district court relied on was a First Circuit opinion finding that unjust enrichment was damages subject to the statutory interest requirement that an application of prejudgment interest is mandatory and that the First Circuit case is binding on the Massachusetts District Court and that a Massachusetts Trial Court decision, which is what appellant cites, is not binding on the Massachusetts District Court. And the support for that is O'Connor v. Oakhurst, 851, Fed Third, 62, Act 72. That's a First Circuit 2017 opinion that notes that state trial court decisions are not binding on a federal district court when applying Massachusetts law. And for that reason, among the others articulated in the brief, we believe the trial court correctly applied Section 6C in finding that prejudgment interest applies to unjust enrichment claims. Thank you, counsel. Mr. Simmons? Thank you, Your Honor. Perhaps five minutes? Okay. So, briefly on the exceptional case, we've made it clear in our brief that the opinion as a whole demonstrates the district court correctly applied octane fitness. The cross appellants presented or framed it in the way they did and the district court just responded to it. We'll also point out that the district court lived with the case for three years and exercised its discretion and did not find that the case stood out amongst others. This is just a rehash of the case under an exceptional case motion. Go back to the ownership issue. Under Section 1, the Alamazo inventors contributed confidential information. The MNDA presumes that information disclosed between the parties is confidential under Section 1, unless proven otherwise, which Sionex didn't do. The record demonstrates that the information HPK disclosed during the evaluation included proprietary methods and know-how, which are by definition confidential as well. The reality is both parties exchanged confidential information. In Section 5 of Appendix 2082, the receiving party acknowledges the disclosing party claims ownership of the confidential information disclosed by the disclosing party and all patent rights in or arising from such confidential information. In this case, both were disclosing parties and both were receiving parties. During the evaluation, it follows that each claims ownership in the patent rights arising from such confidential information they respectively disclosed. The only thing that they're referring to is that they're not aware of confidential information was testimony from Sionex's Dr. Carey who said he wasn't aware of any, but he wouldn't be in a position to know. If I could turn to the breach of contract injunction, you have pointed out that the injunction calls for practicing the disputed patents. This is page 881, S3, 1323, that even in a breach of contract case, injunctions which merely forbid practicing a patent are overly broad. The injunction here is just like Maycomb. It merely forbids practicing the U.S. disputed patents, and it's overly broad for that reason. The disputed patents were only in the case to determine inventorship. There was no adjudication as to the scope of the claims or an analysis of what products would be infringing them, and the cross-appellants in their gray brief at 16 to 17 now urge that the injunction is even broader because they say that practicing means the injunction is worldwide with respect to these U.S. patents. If I could turn to the foreign ownership issue just briefly, I think the cross-appellants are relying on a stipulation about 35 U.S.C. 119. We agree we made that stipulation, but making their argument, it's an improper understanding because 119 doesn't require that the U.S. patents be a translation of the Japanese patents. That's inaccurate, and we actually disputed that on the record. Unfortunately, it's not in the appendix because it wasn't submitted in the briefs, but if it pleases the court, we can submit pages of the transcript from that day of the trial. And we'd also note that cross-appellants are asking the district court, and now this court, to review the U.S. patents without ever giving the court the patent numbers. So there's patents in China, Europe, Korea, Taiwan, none of which are of record in the case, and that's a failure of proof by the cross-appellants. Any questions, Your Honor? Apparently not. No. Thank you, counsel. Thank you, Your Honor. Thank you, panel. Mr. Belanger has, what, three minutes to respond on foreign patents and attorneys. Thank you, Your Honor. And I would start with counsel on the foreign patent issue. Counsel made an observation that Dr. Carey wouldn't be in a position to know whether Hamamatsu had provided confidential information. He was an individual involved in the collaboration, and he testified clearly, Appendix 585, was any of the information in this exhibit Hamamatsu confidential to your knowledge? No. He then, at Appendix 640-41, was walked through. In the Hamamatsu patents themselves, there was a specific comparison between the prior art, what Hamamatsu themselves characterized as the prior art, and the inventive example. The fact that the patent was confidential to Hamamatsu is exactly what was in the, defined by Hamamatsu's prior art. Dr. Carey was asked about whether anything in that, in the patent examples, was Hamamatsu confidential information, and he testified no. And so this is evidence that the district court surely could have reasonably considered in finding that psionics should be deemed the sole owner. They could have considered psionics and become a co-owner of it by mixing it with their own. And certainly the trial court considered that argument and rejected it based on the court's, we believe, correct, but certainly not... Mr. Belanchier, you're asking for co-ownership of all the foreign patents. You haven't specified them. You haven't made them a record, have you? We did make the foreign parent, and that's what we're asking for. And the, just the string side is on page 59 of our... You're just asking for the Japanese patents, not the Korean and Chinese and the European? We're asking for the children, so it's a matter of record the patents that issued from those parent applications. And so, which is typical, I would just turn this to you that it's typical for contracts to assign ownership to foreign patents by stating that it applies to the priority application and any patents issuing from the priority application, and that's what we're asking about. But I can see, Your Honor, that what is in the record is all of the prior, all the priority applications. And the Richardson case does exactly this, Your Honors, by saying that the assignment is for the priority application under Richardson... Counselor, but doesn't, doesn't Section 119 require, priority requires that they be for the same invention? Are you saying that all of these foreign patents from the countries other than Japan are all for the same invention? That's what we're asking for assignment of, yes, Your Honor. There's patents filed under the Patent Cooperation Treaty. I know you're asking for an assignment of them, but are they all for the same invention? Has that been shown? Yes, Your Honor. We believe it has been shown by the way that, simply by claiming priority under the PCT, they are claiming that they are foreign patents are for the same invention. Well, that's a claim. That's a claim. Unless there's an adjudication, one doesn't necessarily get the benefit of the priority application. I understand your position. And just to, if I could break it into two respectfully, so certainly the Japanese parents are in the record, they were the subject of express testimony and they're the subject of stipulation that they are in fact for the same invention. So at a minimum, the Japanese patents should be assigned. We would, we believe that that same finding under Richardson applies to all of the other foreign applications, but we would at a minimum believe that the Japanese patents and Japanese parents should be assigned under the same rationale. Thank you, counsel. We will take the case under submission. Thank you, Your Honor.